Good morning, Your Honor, and may it please the Court. I'd like to, I know that there are two issues before this Court, one having to do with the underlying substantive asylum case, and there was another issue that the Court sought briefing on is basically the continuing application of contrarios aragons to transitional cases. And without going into a great deal of detail, conversation with the Office of Immigration and Mitigation, that their intention is to concede the continuing application of contrarios to the transitional cases. All right. Okay. We're getting an affirmative nod from the government. So. All right. Okay. My name is Howard Davis, representing the Petitioner. The issue here, among others, is whether or not substantial evidence supports the conclusion that the Petitioner lacks a well-founded fear of persecution. And I would say that this case, with regard to well-founded fear, fits into this Court's decision in Lim v. INS. And it's a situation where, in the last three years, where the Petitioner was living in Bethlehem, that he went through a series of constant threats from Hamas. And it began in 1987 with the riots there, and they were basically trying to recruit him, and he would refuse. And he was getting a stream of, at least on ten occasions over the next three years, threats of harm. And in addition, he was – he did speak out at some – at a rally in 1988 and continued to receive threats, and as he mentioned, until he left. And I would say that based on that, the continuing threats which did cause him to leave, and in addition to the fact that the groups that the threats were connected with, namely Hamas, which is still active, well, certainly in the State Department reports that he, at least on the basis of the – of a well-founded fear of persecution from Hamas, that he would fit into this Court's decision in Lim. Kennedy. Well, I – just a matter of curiosity, why would Hamas be wanting to recruit a Christian for joining their ranks? And is the – just so I understand the question, is the – is the Court's question, why would a Muslim group try to recruit someone who is a Christian Arab? Is that – I mean, what's – I can understand his possibly being persecuted in the West Bank for all kinds of reasons, but I just was curious about his – how this recruitment effort amounted to persecution, or why they would even bother with him. Because he is a – he is a Palestinian who lives in the area. I mean, it's also – Hamas is not only an Islamic group, but it's also a political group with a political position with regard – first of all, with regard to the Palestinian Authority, which was – which – and also the Israeli government. The petitioner was specifically opposed to the – the methods of Hamas, of their violent methods, and he – and he preferred a peaceful resolution to this. So in that sense, it's a political thing. All of his problems are in the West Bank, aren't they? He doesn't have any problems in Jordan. There is no indication of that, since he has only spent a very short amount of time. Deportation is to Jordan, isn't it? Well, the deportation is to the West Bank with an alternative to Jordan. And so the first place that he would be going to would be to the West Bank. And whether – and whether or not Jordan takes him is another story. So he may end up in the – He couldn't get off the plane in Jordan and stay there. I'm sorry? He couldn't get off the plane in Jordan and stay there? Well, there is an indication – there is – in the record, it's noted that the passport that he came in with just does not indicate any right to remain there. But he did arrive on a Jordanian passport. Correct. Which has long since expired. Correct, but that – He didn't make any effort to renew it. That is – that is correct, but this case was specifically – Is he a stateless person now? Yes. First of all, there is no indication that he has the right to return to the West Bank, and there is no indication that he has a right to return to Jordan. So at this moment, it is definitely very questionable as to where he could even go to. And in the – We don't have to decide that, though. No. I mean, the issue is – and this is essentially a – this is essentially a silent case from West Bank. The – let's see. And given the fact that he also – there's also – with regard to the record also does not support the finding that he lacked past – that he did not have past persecution. Again, it's the – it's the constant threats over the years. I understand that in Lim the Court was concerned about – about a past persecution based on threats alone. But at some point, there's a quantum leap where just the – where quantity takes it in – takes the suffering into a different level beyond harassment to persecution. And I would say that the number alone, in addition to the menacing factor of Hamas, is – definitely would compel a finding of past persecution. You want to save a little time? I'm sorry? You want to save a little time? Yes. I will save the rest for the rebuttal. Thank you, Your Honor. Good morning. May it please the Court. My name is Ronald Ohata. I am representing the Respondent to the Attorney General, General John Ashcroft, in this matter. Initially, I will indicate that we have revisited the issue that was the purpose of the letter brief, specifically, whether or not automatic tolling of voluntary departure was applicable under the Contreras-Aragon rule to the transition period. And I understand the Court's inquiry. Just at the beginning of this week, I did advise counsel to not prepare that issue, as we have revisited that issue, and we feel that Contreras-Aragon should control the transition period as well. You know, we've got this Desta case pending, which the panel hasn't decided yet, dealing with the issue of voluntary departure in the permanent rules cases. And so the Court is sort of looking at this thing from a number of different perspectives right now. Can you send us a letter? Is there something on the website? In regards to our position for the transition rules? Yes, Your Honor. I can file that. We did not have enough time to get that prepared for today. In terms of the permanent rules under ARERA, I think the Zazueda cases, the – that was the two issues, the Contreras-Aragon or Zazueda. And the letter brief took the position that it was a Zazueda position based upon – we're not going to go into all the argument, but based upon the fact that their – the legal theories behind Zazueda were also applicable during the transition period. Much of the discussion centered around the Contreras-Aragon, I think, characterization of the – what I would call a Hobson's choice of does the person comply with voluntary departure and keep the opportunity for discretionary relief, thereby giving up a right to appeal before this Court, or does the person pursue the appeal in this Court but then give up any – well, let's say be barred by SHAR in any discretionary relief. And that was the one tension, let's say, between the letter brief position and the current position we have. And I think the government has taken the position that the Contreras-Aragon focus on the Hobson choice would not adequately address the letter brief. There's another wrinkle, though, that I'm hoping Dest is going to answer for us, and that is how do we handle the problem of late filed motions for stays of voluntary departure and whether the analysis is different for permanent rules cases versus transitional rules cases. I'm not well briefed on that issue. I just got this issue, to be honest with you, last Thursday and asked that we revisit the transition rules to see if we can get some reconciliation. Well, hopefully Dest is going to enlighten us a little bit, and we'll just have to wait and see what instruction it provides. There is a difference in automatic tolling versus making the request for a stay. Right. And this was an automatic tolling issue that we were addressing. Right. I understand that. But we've got another problem, which is what happens if the period set by the BIA or the IJ for voluntary departure has expired before the Petitioner asks us to revive it somehow. Maybe we could just give you a list of all our problems. You guys could work them out. Well, Your Honor, I've done that in my prior life, so I can tell you what I've got. On the other issue, it's really that of asylum, whether or not the alien has stated a basis for asylum in this case, withholding and protection in cat. The argument was presented in two forms. One is statelessness being a basis for asylum, which is, I think, incorrect. It basically addresses the issue of where a person goes, not whether they're allowed to stay. And statelessness is not a basis for asylum. It's a basis of a designated country, if necessary. In this particular case, it doesn't – the facts doesn't – they don't rise to the level of asylum. There is no past persecution, and there is no well-founded future persecution. The initial application in 1992, I believe, claimed the Israeli authorities were the source of his problems. The immigration judge did find that the Respondent was credible, but notwithstanding the general credibility of his – of his testimony and his documentation, it doesn't rise to the level of persecution. At the testimony before the immigration judge, the Respondent also – sorry – the alien also testified, having been an immigration practitioner. It's difficult to get those terms. But the Petitioner did testify as well that it was Hamas. But he does talk about the difficulty that Hamas was causing him, and I believe at some point he actually testified that the Hamas members carried out the threats and basically had classmates gossiping about him at school and patronized him, and without a definition of what that meant. So when the Hamas actually carried out the threats, the oral threats he was talking about, it was a matter of having people gossip about him and patronizing him. He's also an individual who, in this case, was claiming that he was expelled. And what happened, when you read it, is expelling – expulsion is the equivalent of persecution, but if you look at the facts in this case, in its entirety, he lived in the same house with his mother as an only child for 19 years. His mother was a teacher. His mother had enough wherewithal to have him continue all the way through school. Graduated from school. He got an F-1 student visa. He then came to the United States. He went to Jordan. He got his Jordanian passport for purposes of travel documentation and identity. And at that point, which is contrary to his expulsion argument, he returns to the West Bank. He then, I think in a matter of 60 to 65 days, applies and obtains a visa in Jerusalem. And then he returns home. And at some point, he then boards, I believe it was an Air France plane, goes to Charles de Gaulle Airport, transitions to go to the United States. He didn't apply for asylum there. He testified that he has relatives in Europe, in France. He has a father that he's estranged from who has some status but a right to remain in Guatemala. His mother eventually left the West Bank and came to the United States. And it's my understanding that based on the record, she married an individual who was a lawful permanent resident. So when you look at the totality of his claim, he's in the West Bank. He talks about being stopped by the Israeli soldiers. But the current, I'm sorry. The theme there has always been that it was basically security issues. His home was located in downtown Bethlehem. He actually says that it had been stopped. He had been inspected there. His house had been searched numerous times for weapons and such. But it was for security reasons. He was stopped when he went through border checkpoints. I think the worst incident was where he was asked to paint a fence. Other than that, he was searched, was never arrested. They had an opportunity for all of these years. And since the mid-'90s, the Palestinian authorities have substantially been controlling the area of the West Bank. It is unclear in terms of his statelessness whether he has changed that status because he can return to the West Bank. The Palestinian authorities do control that. The State Department reports in the profile of the sign-offings are very clear that they do not discriminate or persecute Arabs just because they're Christian. There is an issue of individuals who may take political issues. But my understanding, based on this record, is that he does not have a political position, other than once you stay in school and do the best you can. In regards to the record reflecting his ability to return to Jordan, he did indicate that he renewed his Jordanian passport at one point. And then he had an extension, but then he did not do so after. But he did testify that he could do so. And that, I don't believe, is controverted here, that he does have the option of renewing that Jordanian passport. And the Jordanian government has been quite good about providing travel documents for Palestinians. In terms of the residency issue, when it was the Israeli authority, there were strict rules. Now it's the Palestinian authority that handles it. I don't see anything in the record to indicate why the Palestinian authority would not allow a Palestinian to return to his home in the West Bank. We don't have any evidence of past persecution, and we do not have a well-founded for future persecution. It doesn't rise to the level of any kind of torture by either Hamas, the Palestinian authorities, or the Israeli authorities in this particular case. It really is a matter of whether or not the Respondent is permitted to remain as a refugee or whether he will need to return and seek his visa priorities according to the laws of the United States. Up to this point, he's been here for 14 years, and his life went on a progression, which was quite normal and not one of a person who's fleeing persecution and fleeing for his life. And therefore, the government would ask that the court deny the request for asylum and other forms of relief. The court does, again, concede the issue on the automatic tolling of voluntary departure. Thank you. Just a few items with regard to what the petitioner experienced before he left the West Bank. First of all, with regard to the characterization of what was done to him was, or the carrying out of threats through gossip occurred after 1988. It doesn't take into account 1987. But gossip in and of itself is not a small thing because it's part of a means of social control or political control. And he continued to, in fact, he was threatened, as it states in the record, just before he left the West Bank and there was a threat of trying to prevent him. But, again, the fact that threats were not carrying out, it's the presence of threats. Threats are just another way of saying we don't want you here or join us and comply with what we want. The other thing, the fact that he went to school, lived in a home for all those years before he left is really of a small matter. I mean, in a, for example, in a case which was not cited here, GUI, I mean, GUI versus INS, I mean, and I think it was in Romania, he had a good job and home and all that. I mean, the fact of having all those things, if that would prevent people from having asylum, from getting asylum, then a lot of people would be otherwise meritorious, would be prevented from getting asylum. He came to the United States. His mother was in the United States. With regard to the Israeli soldiers, I mean, it wasn't just a matter of painting a fence. He was also slapped and kicked around. And the thing is, is that the Israeli soldiers were also an occupying force, and he's a Palestinian Arab. I think that there's that power dynamic there. The other thing with regard to, you know, that an area might be under the Palestinian Authority, again, the question is whether or not they can, the Palestinian Authority can control Hamas. And I think it's pretty clear on the record that they can't and that they're my time is up, I see. Okay. Thank you. Thank you very much. Court will recess until 9 a.m. tomorrow morning. Thank you.
judges: Goodwin, Pregerson, Tallman